# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 18, 2016        Decided April 19, 2016

No. 15-7030

COSTCOMMAND, LLC,
APPELLANT

v.

WH ADMINISTRATORS, INC. AND BRENDAN M. TURNER,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00457)

*Patrick A. Klingman* argued the cause for appellant. With him on the briefs was *Christopher Kip Schwartz.*

*David A. Hill*, pro hac vice, argued the cause for appellees. On the brief was *Thomas A. Duckenfield III.*

Before: TATEL, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case calls on us to perform a single task: apply the "nerve center" test that the Supreme Court laid out in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010), to

determine the location of a corporation's "principal place of business," and thus its citizenship for diversity jurisdiction purposes. For the following reasons, we agree with the district court's application of this test and affirm its dismissal for lack of subject matter jurisdiction.

**I.**

Understanding this case's decisive jurisdictional issue requires only a bird's-eye view of the complicated underlying factual allegations. Ronald Vance and Brendan Turner founded CostCommand, LLC in 2012 with the goal of providing regulatory compliance services to government contractors. CostCommand hired PRS Software Solutions, a subsidiary of Video Equipment Rentals, two California companies we refer to collectively as the "California defendants," to produce software to enable it to provide such services. After struggling to secure customers and revenue, CostCommand sought and obtained additional funding from the California defendants. Around this time, Turner resigned from CostCommand. Unbeknownst to Vance, however, Turner was also developing his own company, WH Administrators, Inc. (WHA).

CostCommand sued Turner, WHA, and the California defendants in the U.S. District Court for the District of Columbia alleging that they engaged in a series of wrongful acts that essentially destroyed CostCommand's business. As described in greater detail below, the district court concluded that it lacked diversity jurisdiction and dismissed the case.

For diversity jurisdiction to exist, no plaintiff may share state citizenship with any defendant. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). For example, a New York plaintiff would be unable to bring a diversity suit against three defendants if any one of them had New York citizenship.

Citizenship is measured as of the time the plaintiff files the complaint. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570–71 (2004). An individual has citizenship in a state for diversity purposes if he is an American citizen and is domiciled in the state. *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989). Unincorporated associations, including LLCs, have the citizenship of each of their members. *See Americold Realty Trust v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016). A corporation is a citizen of its place or places of incorporation, as well as its principal place of business. 28 U.S.C. § 1332(c)(1). Under *Hertz*, a corporation's principal place of business is its "nerve center," i.e., "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." 559 U.S. at 80–81.

In this case, no dispute exists as to the citizenship of any party except WHA. When CostCommand filed its complaint, it was a citizen of Maryland because it was an LLC whose sole member, Vance, was a citizen of Maryland. The California defendants were citizens of California because they were California corporations with California principal places of business. Defendant Turner was a citizen of the District of Columbia. Finally, although all parties agree that WHA was a Texas corporation, and was therefore a Texas citizen, they disagree—and this is the central issue in this case—as to whether WHA's principal place of business lay within Texas or Maryland. If the latter, then WHA shared Maryland citizenship with CostCommand, and no diversity jurisdiction exists.

This case's procedural history is also relevant, though somewhat more complicated. The saga begins with CostCommand's district court complaint, which alleged that "Defendant[] WH Administrators, Inc. . . . is a Texas

corporation . . . and maintains its principal place of business in Houston, Texas." Compl. ¶ 7. Turner's and WHA's answers both admitted this allegation. In addition to the answers from Turner and WHA, the complaint generated a number of motions to dismiss, including one from the California defendants for lack of subject matter jurisdiction. These defendants argued that WHA maintained its principal place of business in Maryland because, among other things, WHA's website listed its Bethesda office as its "corporate headquarters." CostCommand's only response was that WHA and Turner had admitted in their answers that WHA maintained its principal place of business in Texas.

Noting this dispute, the district court ordered WHA to make a supplemental filing clarifying the location of its principal place of business and providing supporting evidence. In response, Turner and WHA apologized to the court for what they termed inadvertent mistakes in preparing their answers. They explained that WHA in fact maintained its principal place of business in Maryland, and they filed supporting affidavits from Turner and Bob Ring, a founder and officer of WHA who provided the company's initial capital. Several days later, the district court issued an order concluding that the Bethesda office was WHA's principal place of business and granting the motion to dismiss.

The next day, CostCommand filed a motion for reconsideration and requested jurisdictional discovery. After the parties fully briefed this motion, the district court allowed jurisdictional discovery limited to a deposition of Turner and requests for production of documents. Thereafter, the district court received three supplemental filings—one jointly from WHA and Turner, one jointly from the California defendants, and one from CostCommand.

In its filing, CostCommand argued that various factors demonstrated that WHA maintained its principal place of business in Texas. These included WHA's use of its Houston address on various corporate documents, regulatory filings, and contracts with customers and vendors; Bob Ring's location in Houston; the fact that Andy Ring, Bob Ring's son, managed accounts payable and receivable in Texas in conjunction with a Texas accountant; and the fact that WHA paid its taxes from its Houston office and maintained its primary bank account in Houston.

By contrast, the defendants pointed to several factors that they believed demonstrated a Maryland principal place of business. Among these were that Turner, who worked out of the Bethesda office, had full operational control of WHA, including spending company money without the other directors' approval; that the other two directors needed Turner's approval before spending company money; that Turner "manage[d] 100 percent of the operations, the product development, the client issues," Turner Dep. 53:21–54:1; and that when Turner disagreed with other directors, he did what he thought best.

After considering these submissions, the district court denied CostCommand's motion for reconsideration. Although the district court first concluded that CostCommand had failed to demonstrate any exceptional circumstance justifying reconsideration, it also addressed the merits of the jurisdictional inquiry. In doing so, it reaffirmed its conclusion that WHA maintained its principal place of business in Maryland. CostCommand timely appealed both the dismissal and the denial of its motion for reconsideration. Although CostCommand has settled its claims with the California defendants, its appeal remains live as to Turner and WHA. In its briefing in this court, CostCommand argued that instead of

dismissing the case, the district court should have dropped WHA as a non-diverse party, *see* Appellant's Br. 40–44, but it expressly abandoned that idea at oral argument, *see* Oral Arg. Rec. 4:49–56.

## II.

We typically review a district court's dismissal of a case for lack of jurisdiction de novo, *Trumpeter Swan Society v. EPA*, 774 F.3d 1037, 1040 (D.C. Cir. 2014), and its denial of a motion for reconsideration for abuse of discretion, *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014). CostCommand argues that the district court should have given it more of an opportunity to litigate the jurisdictional issue before dismissing the case, and that the district court's failure to do so harmed CostCommand given the disfavored status of motions for reconsideration. We need not consider this argument, however, because the district court's determination—after allowing jurisdictional discovery—that WHA maintained its principal place of business in Maryland was correct under any standard. We thus assume for the sake of argument that de novo review applies to the district court's determination in its reconsideration denial that WHA maintained its principal place of business in Maryland and treat as moot any argument that the district court entered its initial dismissal order without giving CostCommand an adequate opportunity to respond.

In *Hertz*, the Supreme Court gave clear guidance for determining the location of a corporation's principal place of business. The Court described its approach as follows:

> We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts

of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Hertz*, 559 U.S. at 92–93. Acknowledging that difficult cases would still arise in situations where control was dispersed, the Court observed that the nerve-center test had the benefit of "point[ing] courts in a single direction, toward the center of overall direction, control, and coordination." *Id.* at 96. This ensures that "[c]ourts do not have to try to weigh corporate functions, assets, or revenues different in kind, one from the other." *Id.*

Applying this standard, we think it clear that WHA maintained its principal place of business in Maryland. Overwhelming evidence establishes that when the complaint was filed (and indeed, throughout WHA's existence) Turner—from his office in Bethesda—exercised virtually complete control over the company. Turner testified to that effect in both his deposition, *e.g.*, Turner Dep. 53:19–61:15, and affidavit, Turner Aff. ¶¶ 9–10, and Bob Ring testified that he left the operation of WHA "to the sound discretion of Mr. Turner," Ring Aff. ¶ 8. From "[d]ay one," only Turner had authority to spend company funds without approval, Turner Dep. 24:16–25:8, and when Turner disagreed with the other directors, he nonetheless "operated the business as [he] saw fit," Turner Aff. ¶ 10. Under *Hertz*, this is more than enough to establish a principal place of business, and thus citizenship for diversity purposes, in Maryland.

Resisting this simple conclusion, CostCommand raises two primary arguments. First, that it was entitled to rely on the admissions in Turner's and WHA's answers that WHA maintained its principal place of business in Texas. And second, that the factors relied on by circuit and district courts that used the nerve-center test prior to *Hertz* establish a Texas principal place of business in this case.

The first argument requires little discussion. Although CostCommand admits that parties cannot create jurisdiction by stipulation, it insists that they can stipulate to facts that provide a basis for jurisdiction. Even assuming for the sake of argument that this is true, and even assuming that the location of a party's principal place of business is such a factual question, *but see* 13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3625 (3d ed. 2009) ("Although the determination of a corporation's principal place of business involves a fact specific inquiry, the weight to be given these factual elements is a question of law . . . ."), CostCommand's argument suffers from a fatal flaw: the California defendants neither stipulated nor admitted that WHA maintained its principal place of business in Texas. Instead, they challenged this claim in their first responsive filing.

CostCommand's second argument fares no better. According to CostCommand, by adopting the nerve-center test and citing previous circuit and district court cases applying it, the Supreme Court implicitly adopted the factors these earlier cases had used to locate a corporation's principal place of business, such as where the corporation keeps its bank account and pays taxes from. As CostCommand points out, since *Hertz*, the Fourth Circuit has twice looked to such objective factors in determining a corporation's principal place of business. *Hoschar v. Appalachian Power Co.*, 739

F.3d 163, 172 (4th Cir. 2014); *Central West Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 105 (4th Cir. 2011).

At a sufficiently high level of generality, the idea that the pre-*Hertz* factors still apply makes sense. Especially in close cases, which *Hertz* itself acknowledged would continue to arise, many such factors will remain relevant to *Hertz*'s central question: where is the corporation's nerve center? The Fourth Circuit's reference to, for example, the location of a corporation's officers and directors, *see Hoschar*, 739 F.3d at 172, is thus unsurprising. But as the Fourth Circuit has also noted, *Hertz* made clear that "the touchstone now for determining a corporation's principal place of business for diversity purposes is 'the place where the corporation's high level officers direct, control, and coordinate the corporation's activities.'" *Central West Virginia Energy*, 636 F.3d at 107 (quoting *Hertz*, 559 U.S. at 80). The factors courts had previously relied on retain relevance only to the degree they speak to this "touchstone" inquiry.

Unfortunately for CostCommand, here they do so minimally if at all. CostCommand summarizes the factors that it claims support a Houston, Texas, principal place of business as follows: "Houston is where WHA told State authorities, customers, vendors and its landlord it could be found, it was where in-person, strategic meetings were conducted, it was where tax filings were made, where its corporate records are kept, where its primary counsel, accountants and bank account are located, and the place specified as its headquarters in its corporate charter." Appellant's Br. 39–40. Except for the alleged "in-person, strategic meetings," the factors composing this list have little to do with "where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz*,

559 U.S. at 80. Although some corporate activities occurred in Texas, Turner oversaw and controlled them from Maryland.

CostCommand's strongest argument takes the form of attacking the conclusion that Turner had absolute control over WHA. CostCommand offers two main pieces of evidence in support of this position. First, it contends that Bob Ring, from his office in Texas, funded the company and maintained control through his son Andy, who handled the company's finances, also from Texas. CostCommand calls particular attention to Turner's deposition testimony describing this arrangement as a "safety net." *See* Turner Dep. 25:9–26:9. The problem with this argument is that, as noted above, record evidence makes clear that Turner made decisions regarding the company, even when he and Bob Ring disagreed. As Ring put it: "Unlike other entities I own, I do not operate WHA. I leave that to the sound discretion of Mr. Turner." Ring Aff. ¶ 8. Turner confirmed that "[e]ven where there may have been a disagreement on business issues . . . I operated the business as I saw fit." Turner Aff. ¶ 10. CostCommand's suggestion that Andy Ring served as a check for his father on Turner's control of the company thus falls flat.

Second, CostCommand points to the fact that Bob Ring never traveled to Maryland to meet with Turner, but that Turner met with Ring in Houston on multiple occasions. In context, however, the record makes clear that most of the time Turner talked to Ring, he did so by phone. To be sure, they did occasionally meet in Houston. But those meetings seem to have been incidental to trips Turner was making to Houston to meet with clients. Turner Dep. 27:8–10. Moreover, as noted above, Turner retained practically complete authority, and his conversations with Ring were more in the nature of Turner

seeking advice than of collective decision making about the company's direction. Turner Aff. ¶ 10.

## III.

For the foregoing reasons, we affirm the district court's dismissal for lack of subject matter jurisdiction.

*So ordered.*